UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT GREENEVILLE

| | | |
|---|---|---|
| JENNIFER METCALF | ) | |
| | ) | |
| V. | ) | NO. 2:03-CV-332 |
| | ) | |
| LINCOLN LOGS INTERNATIONAL, | ) | |
| LLC; REGENCY HOLDINGS, INC.; | ) | |
| RICHARD SHOFF; and | ) | |
| YORLENA B. RIVERA | ) | |

## MEMORANDUM OPINION

This suit was initially filed in the Chancery Court for Greene County, Tennessee. It was removed to this Court on the basis of the diversity of citizenship of the parties. Pursuant to 28 U.S.C. § 636, the parties consented that the Magistrate Judge try the case to its conclusion. Although a jury initially was demanded, that demand was subsequently withdrawn upon the parties' agreement. A bench trial was held on January 26 and 27, 2006.

Plaintiff is a citizen and resident of Tennessee. The primary defendant, Lincoln Logs International, LLC ("Lincoln Logs") is a limited liability company with its principal place of business in Kannapolis, North Carolina. Lincoln Logs manufactures and sells log home "kits." These kits are pre-cut, pre-fitted logs used for the exterior walls of log homes. It sells its log home kits throughout the United States and even internationally. The company has many different models of log home kits, differing in size, configuration, and price. It sells only to "dealers," who act as

independent contractors, and not directly to the ultimate consumer. A dealer buys a particular kit and then resells it to the end buyer. Becoming a dealer for Lincoln Logs is not a particularly rigorous undertaking; all that is required is that the individual first agrees to purchase a kit by making a six thousand dollar ($6,000) down payment toward the price, and then executes a dealer agreement. Thereafter, Lincoln Logs provides some amount of orientation and training to the new dealer. Afterwards, the dealer finds buyers for kits; after finding a buyer, the dealer buys the desired kit and then re-sells it to the consumer. After several successive purchases, the dealer's cost decreases, although the dealer is free to sell kits at whatever price the market will bear.

The defendant Shoff is the Chief Executive Officer of Lincoln Logs. The defendant Rivera is Mr. Shoff's wife.

The defendant, Regency Holdings, Inc. ("Regency"), is a North Carolina corporation, and owns the building and equipment with and in which Lincoln Logs manufactures its products.

Plaintiff alleges that she purchased a "Portland" log home kit *directly from Lincoln Logs* on January 25, 2003, for $23,975; that Lincoln Logs subsequently raised the price by $4,500; that she thereupon demanded the return of money; and that Lincoln Logs refused, notwithstanding that it had not yet cut any logs or taken any action whatsoever with respect to her purchase of a log home kit. Plaintiff initially filed suit against Lincoln Logs only, claiming that Lincoln Logs was guilty of fraudu-

lent and deceptive acts and practices under the Tennessee Consumer Protection Act.[1] She requested a judgment in the amount of $23,975 representing the money she had paid Lincoln Logs, plus treble damages and the recovery of attorney fees as allowed by the Tennessee Consumer Protection Act.

The Court has held that North Carolina law applies to this diversity action, inasmuch as all of the events that precipitated this litigation occurred at Lincoln Logs' facility in Kannapolis, North Carolina. As a practical matter, it matters not whether North Carolina's or Tennessee's substantive law applies; the outcome of this case would be the same.

Remarkably, there is very little dispute regarding the circumstances that led up to this litigation. The plaintiff is a well-educated, articulate, obviously highly intelligent nurse practitioner. In the fall of 2002, plaintiff and her husband were estranged and they divorced in early 2003. As a result of that divorce, they divided their assets; they owned two homes, both of which were sold and the proceeds divided between them. They had two boys, who were and are in the custody of plaintiff. Plaintiff and her sons were living with her parents, clearly a situation that could not persist indefinitely. Thus, plaintiff was looking for a home, and not unexpectedly she had a very definite budget within which she had to operate. Her friend and co-worker, Brenda Brown ("Ms. Brown"), in some fashion had learned of Lincoln Logs and the

---

[1] Tenn. Code Ann. § 47-18-109.

business opportunities presented by becoming a dealer for that company. She communicated her interest in becoming a dealer to Lincoln Logs, subsequently receiving a packet of information which contained a brochure of the various log home kits manufactured by Lincoln Logs and other pertinent information. Ms. Brown understood enough of that information to realize that she had to buy a log home herself before she could become a dealer. Somehow Ms. Brown got the impression that this first log home would cost her only $6,000, which would have been only a third of the cost of the cheapest log home sold by Lincoln. How Ms. Brown got this idea is unknown, although there was no evidence that she was told that, either in writing or orally, by any representative of Lincoln Logs. As she tacitly acknowledged during her testimony, it is likely that Ms. Brown confused the requirement for a $6,000 *down payment* with the actual cost of the log home kit; this was the first mistake in a string of mistakes and misunderstandings. Ms. Brown wanted to become a dealer for Lincoln Logs; she knew that she had to first buy a log home kit to become a dealer; she knew her friend, plaintiff, very badly needed a home; she believed that the cost of this log home would be only $6,000; she knew that since plaintiff was operating under a tight budget, plaintiff could realize the benefits of this cheap log home kit; and, when all was said and done, everyone would win: Ms. Brown would have sold her first home, thereby making her a dealer, and plaintiff would have a log home kit at a fraction of the cost.

At that time, one of the marketing directors for Lincoln Logs was Mr. Mark

4

Miles. Ms. Brown telephonically contacted Mr. Miles and asked if she could travel to Kannapolis, North Carolina, to meet with him; Mr. Miles agreed. Somewhat out of the ordinary, as far as Mr. Miles was concerned, this meeting had to occur on a Saturday to accommodate either the schedule of Ms. Brown or that of one of her traveling companions.

On Saturday, January 25, 2003, Ms. Brown, plaintiff, and another friend, Kristi Irwin, drove to Kannapolis to meet with Mr. Miles. Plaintiff has purchased a cashier's check, payable to herself, in the amount of $6,000.[2] For the sake of convenience, the women met Mr. Miles at a Hampton Inn. From there, they drove about the community and looked at log home residences. They then went to Lincoln Logs' offices, toured that facility, and were introduced to Mr. Shoff. Mr. Miles and the three women then sat down in his office and got down to business.

Ms. Brown's mistaken impression that the first log home kit would cost only $6,000 was immediately corrected. The cost of the kit was $23,975; the $6,000 was only the down payment, as noted earlier. Nevertheless, plaintiff believed that $23,975 was still a very good price and she wished to proceed with the purchase. Sadly, another series of events began to unfold that led to mistakes, misunderstandings, and ultimately this litigation. Plaintiff, of course, had earlier looked through Ms. Brown's brochure that contained photographs and floor plans of each log home kit manufactured by

---

[2] Exhibit 5.

Lincoln Logs. Obviously, some kit models are larger than others and, of course, cost more. Plaintiff had her heart set on the "Portland" model, a log home kit which, when erected, contained nearly 2,900 square feet. With two boys in her care, it is not surprising that she both needed and wanted a home with at least these dimensions. Lincoln Logs also sold a model called the "Gatlinburg," which contained something less than 2,000 square feet of living space. Because all three women had been under the erroneous impression that the first kit purchased by Ms. Brown would cost only $6,000, the *actual* cost of any particular log home kit was virtually irrelevant to them. In retrospect, this appears to be palpably unreasonable, but the Court completely credits the testimony of all three women in this regard, especially that of plaintiff.

For reasons discussed later in this opinion, plaintiff and her friends were operating under the assumption that the sale of the log home kit was directly from Lincoln Logs to plaintiff, and that Ms. Brown would be given "credit" for this sale in satisfaction of Lincoln Logs' requirement that a person first buys a log home kit before becoming a dealer. Mr. Miles, however, did not believe that he was selling a log home kit directly to plaintiff, nor did he intend to do so; but, as discussed hereafter, his actions certainly created the *appearance* that he was making a direct sale to plaintiff.

Mr. Miles filled out a purchase order (Exhibit 6), which clearly listed Brenda Brown as the buyer. Plaintiff noted Ms. Brown's name on the purchase order, and inquired of Mr. Miles why he had listed Ms. Brown as the buyer. According to the

6

plaintiff, Mr. Miles gave some vague answer along the lines of "it just has to be this way." Actually, it did indeed "have to be that way" under Lincoln Logs' established method of doing business. Unfortunately, plaintiff and Mr. Miles interpreted that casual remark in differing ways.

The next link in this chain of misunderstandings occurred when plaintiff tendered her $6,000 cashier's check to Mr. Miles. As noted earlier, that cashier's check was drawn on First Tennessee Bank and made payable to plaintiff. Plaintiff endorsed that cashier's check, as follows: "Pay to the order of Lincoln Logs International s/Jennifer Metcalf," and handed it to Mr. Miles. Miles took custody of that check and it ultimately was deposited into Lincoln Logs' bank account. This procedure was undeniably in violation of the dealer agreements entered into between Lincoln Logs and its various dealers; those dealer agreements were and are designed to insure that dealers remain independent contractors, and that they never act as the agent or employee of Lincoln Logs. With regard to Mr. Miles' acceptance of the cashier's check made payable to plaintiff, which she endorsed to the order of Lincoln Logs, such was in direct contradiction of paragraph 10(b) of the dealer agreement: "Lincoln will not accept checks directly from customers of the Dealer."[3] Obviously, this provision of the dealer agreement was designed to maintain a barrier between Lincoln Logs and the ultimate consumer. However, Mr. Miles' acceptance of the cashier's check created the

---

[3]Exhibit 1.

impression that plaintiff was dealing directly with Lincoln Logs. Moreover, Ms. Brown was not yet a dealer; this sale was "her" first sale that was a necessary predicate to her *becoming* a dealer. From Mr. Miles' perspective, he was attempting to facilitate the transaction. He knew fully well that Ms. Brown wanted to be a dealer, and that this was to be her sale. It was for that reason that he filled out the purchase order and the other documents as he did. But plaintiff concluded, and reasonably so, that she was dealing directly with Lincoln Logs.

And it is at this juncture that the next link in the chain of misunderstandings occurs. The purchase order was preprinted to show that the buyer was purchasing the Gatlinburg model. The Gatlinburg model is the one usually purchased by incipient dealers, since it is the cheapest. But, since plaintiff had her heart set upon the Portland model, and since Mr. Miles was aware of that, he added in his own handwriting "Portland." The purchase order also contained this preprinted language: "Dealer may substitute log kit for any approved home or custom design, at current retail price." Objectively, Mr. Miles understood that language to mean that, if the dealer-buyer wanted a model other than the Gatlinburg, the dealer could substitute that model by paying the appropriate price. Sadly, plaintiff did not appreciate the significance of this language and was fixated on the price set forth on the purchase order: $23,975. That purchase order reflected that she had paid $6,000 toward that price and owed a balance of $17,975, which was to be paid sixty days from January 25, 2003. However,

8

$23,975 was the cost of the Gatlinburg model, not the Portland.

After the delivery of the $6,000 cashier's check to Mr. Miles, Ms. Brown signed the dealer agreement and – *voila* – she became a dealer.[4] Armed with a copy of her purchase order, and believing that she had just contracted to buy a Portland log home kit from Lincoln Logs for $23,975, plaintiff and her friends returned home to Greeneville, Tennessee.

Knowing that she was obligated to pay the balance of the purchase price before March 25, 2003, plaintiff purchased another cashier's check in the amount of $17,975. Unlike the first cashier's check, which was made payable to plaintiff herself, this check was made payable to Lincoln Logs International, LLC. Interestingly, the Remitter is shown to be "Brenda C. Brown," not plaintiff, although plaintiff's funds undeniably were used to purchase this cashier's check. Of course, under Lincoln Logs' protocol, it was required that the payment come from the dealer, Ms. Brown, since Lincoln Logs did not deal directly with the end consumer. From plaintiff's perspective, however, she directed that Brenda Brown be reflected as the Remitter only because Ms. Brown was going to personally deliver the check to Mr. Miles in Kannapolis, North Carolina. This second check was delivered to Lincoln Logs, and plaintiff awaited the arrival of her logs. And she continued to wait until late April or early May, when she was contacted by Ms. Brown who told her that a mistake had been

---

[4] She was, of course, required to attend a few orientation training sessions, which she ultimately did in the succeeding months.

9

Case 2:03-cv-00332   Document 123   Filed 02/13/06   Page 9 of 20   PageID #: 67

made, and that Lincoln Logs was demanding an additional $4,500 before the logs would be cut. This $4,500, as it turned out, was the result of the higher cost of the Portland home. The Gatlinburg home cost $23,975, the amount reflected on the purchase order. The Portland home actually cost $28,475. To say that plaintiff was distressed is an understatement. Both Ms. Brown and plaintiff insisted that Lincoln Logs had agreed to sell to plaintiff a Portland log kit for $23,975. Mr. Miles responded to Ms. Brown, and truthfully so, that he had made a mistake, and that he simply should have prepared an entirely new purchase order on January 25, 2003, that unequivocally reflected both the correct log home kit and the price therefor.

And it is at this point that Lincoln Logs made a terrible tactical error. Insisting that its "customer" was Ms. Brown, its putative dealer, Lincoln Logs steadfastly refused to negotiate with plaintiff. When plaintiff asked that her money be returned, Lincoln Logs took the position that plaintiff should look to Ms. Brown for the return of her money. This surely was a maddening response, and even an outrageous one. Lincoln Logs had in its possession $23,975 of plaintiff's money, for which it had not yet cut a single log and Ms. Brown had none of the money. Nevertheless, Lincoln Logs obstinately relied on its dealer agreement and the barrier that agreement raised between it and the end consumer. Had Lincoln Logs even casually investigated this matter, it should have realized that Mr. Miles' actions on January 25 at the very least created the impression that plaintiff was dealing directly with Lincoln Logs. In this

10

same vein, even under Lincoln Logs' own Dealer Agreement, Ms. Brown could not possibly have been a dealer at the time Miles accepted the $6,000 cashier's check directly from plaintiff; there first had to be a "sale" of the log home kit, and then an execution of the dealer agreement, neither of which had occurred at that time. Further, Ms. Brown was woefully ignorant regarding the business of selling log homes; she knew nothing at all. Mr. Miles simply chose to act on her behalf to facilitate matters, which conveyed to plaintiff the impression that she was dealing directly with Lincoln Logs. Plaintiff ultimately retained the services of an attorney, and that attorney wrote to Lincoln Logs, as well as to Mr. Miles himself, requesting that plaintiff's money be returned to her.[5] Those letters generated a telephonic response from Lincoln Logs' attorney, Mr. Strip, in which plaintiff or her attorney was requested to provide documentation showing that plaintiff made payments directly to Lincoln Logs. Plaintiff's attorney provided that information by letter dated June 13, 2003.[6] In that letter, plaintiff's attorney primarily stressed two facts: the circumstances surrounding the endorsement and delivery of the $6,000 cashier's check, and Mr. Miles' involvement in the transaction. In response, Lincoln Logs' attorney essentially chose to ignore the $6,000 check, and seized upon the subsequent cashier's check in the amount of

---

[5]Exhibits 35, 36.

[6]Exhibit 36.

11

$17,975, which showed the Remitter to be "Brenda C. Brown," not the plaintiff.[7] His letter suggested that any settlement would have to involve Brenda Brown since there was no privity of contract between Lincoln Logs and plaintiff, and concluded by saying that Lincoln Logs would be willing to return a *part* of the funds, but intended to keep some of the money as "loss of profit."

At this point, things spiraled totally out of control. Suit was filed in the Chancery Court for Greene County, Tennessee, in September 2003, and then removed to this Court. Lincoln Logs found itself accused of fraudulent acts and practices and sued for $23,975, plus treble damages, plus attorney's fees.

In March 2004, the parties were well on their way to crossing the Rubicon, but they were not yet to the other side. Mediation was attempted, but even that effort at such a salutary goal blew up in everyone's face. On March 10, 2004, Attorney Strip wrote a letter[8] to Lincoln Logs' local counsel in which he made the following points, among others: (1) Lincoln Logs was amenable to returning $6,000 to plaintiff, but plaintiff would have to look to Ms. Brown for the remaining $17,975 (notwithstanding that Lincoln Logs was holding the entire $23,975), and (2) Lincoln Logs was judgement-proof, having no assets of any type. Obviously Attorney Strip intended that information concerning Lincoln Logs' financial status be communicated to plaintiff's

---

[7]Exhibit 37.

[8]Exhibit 9.

attorney, and that it be used for leverage in the settlement negotiations. It had quite the opposite effect.

Plaintiff amended her suit to add Shoff and Rivera as defendants, claiming that these two individuals "used the corporation [sic] as their alter ego to conduct [their] business," and that they had "loaned money to the corporation [sic] which it . . . used for operating funds . . . ." Further, with respect to Shoff and Rivera, plaintiff alleged that Shoff and Rivera "caused the operating assets of Lincoln Logs . . . to be owned by other related entities [i.e., Regency Holdings, Inc.] so that the defendant, Lincoln Logs International, LLC does not even own the assets necessary to conduct its business operations." Plaintiff asks that the "corporate veil" of Lincoln Logs be pierced and that Shoff and Rivera be held personally liable for any damages awarded against Lincoln Logs.

Plaintiff also added Regency Holdings, Inc., as a new defendant, asserting that Regency and Lincoln Logs were joint venturers, each acting as the agent of the other, with respect to the manufacture and sale of log home kits. Thus, plaintiff alleged that Regency was vicariously liable for the alleged deceptive acts and practices committed by Lincoln Logs, by which plaintiff suffered her damages.

Plaintiff also relied on North Carolina's Consumer Protection Act,[9] in addition to the Tennessee Consumer Protection Act. She also alleged that Lincoln Logs was

---

[9]N.C.G.S. § 75-1.1.

guilty of common law fraud.

Also, as a result of Attorney Strip's March 10 letter, plaintiff's attorney contacted Ms. Brown and advised her that Lincoln Logs was claiming that it was holding $19, 975 "for the benefit of . . . Brenda Brown." Ms. Brown promptly executed an affidavit,[10] in which she asserted that all that money should be returned to plaintiff.[11]

Apparently nothing of any significance transpired thereafter with respect to settlement of the suit, and a great deal of time and expense was expended in preparing this case for trial. Indeed, plaintiff's attorney has filed an affidavit in which he recites his attorney's fee is now in excess of $36,000.

Lincoln Logs' actions must be viewed at two separate and distinct times. First, there was the transaction on January 25, 2003, which involved Mr. Miles. Then the Court should consider the actions of Lincoln Logs after May 2003 when it first learned that Mr. Miles had made a mistake on the purchase order.

With respect to the transaction on January 25, 2003, the evidence falls far short of demonstrating that Mr. Miles was guilty of fraud or any deceptive act or practice. He made a mistake, pure and simple, and nothing more. His mistake, coupled with a number of other misunderstandings and misapprehensions, led to

---

[10] Exhibit 10.

[11] That affidavit also reflects that she had orally conveyed that same information to Mr. Miles at some earlier time.

14

catastrophic results, but the fact remains it was merely a mistake. As far as common law fraud is concerned, under the substantive law of North Carolina, "fraud" requires a scienter of an intent to deceive.[12] The evidence fails to support plaintiff's allegation of common law fraud with respect to the events occurring on and around January 25, 2003.

As regards the North Carolina Consumer Protection Act, that statute reads as follows:

> **§ 75-1.1. Methods of competition, acts and practices regulated; legislative policy**
>
> (a) Unfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce, are declared unlawful.
>
> (b) For purposes of this section, "commerce" includes all business activities, however denominated, but does not include professional services rendered by a member of a learned profession.
>
> (c) Nothing in this section shall apply to acts done by the publisher, owner agent, or employee of a newspaper, periodical or radio or television station, or other advertising medium in the publication or dissemination of an advertisement, when the owner, agent or employee did not have knowledge of the false, misleading or deceptive character of the advertisement and when the newspaper, periodical or radio or television station, or other advertising medium did not have a direct financial interest in the sale or distribution of the advertised product or service.

---

[12] *See, e.g., Myers & Chapman, Inc. v. Thomas G. Evans, Inc.*, 374 S.E.2d 385 (N.C. 1988).

15

> (d) Any party claiming to be exempt from the provis-
> ions of this section shall have the burden of proof with
> respect to such claim.

N.C.G.S. § 75-1.1.

Plaintiff relies upon *Walker v. Branch Banking and Trust Co.*, 515 S.E.2d 727 (N.C. App. 1999), to support her argument that Mr. Miles' acts were violative of the Act:

> To prevail on a claim based on an alleged unfair tract practice,
>> a plaintiff must show (1) an unfair or deceptive act or practice, or unfair method of competition, (2) in or affecting commerce, (3) which proximately caused actual injury to plaintiff or his business. A practice is deceptive if it has the capacity or tendency to deceive the average consumer, but proof of actual deception is not required. Whether the practice is unfair or deceptive usually depends upon the facts of each case and the impact the practice has in the marketplace. *The plaintiff need not show fraud, bad faith, deliberate acts of deception or actual deception, but must show that the acts had a tendency or capacity to mislead or created the likelihood of deception.* "A practice is unfair when it offends public policy and when the practice is immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers."

515 S.E.2d at 729. [Italics supplied; internal citations omitted.]

It is the italicized portion of this quote from the *Walker* case upon which plaintiff primarily relies, arguing that it is not necessary for her to show fraud, bad faith, deliberate acts of deception, or actual deception. Rather, she argues that *Walker* supports her argument that she is merely required to show that Miles' and Lincoln

16

Logs' actions had a "tendency or capacity to mislead" and that they "created the likelihood of deception." Taken out of its context, the italicized sentence from *Walker* would support a claim for treble damages and attorney's fees for negligent (as opposed to intentional) misrepresentation. It also would support an award of treble damages and attorney's fees for a mere breach of contract. But that single sentence cannot be read out of its context. As the quotation itself reflects, "'[a] practice is unfair when it offends public policy or when the practice is immoral,'. . ." Mr. Miles made a *mistake* regarding the preparation of the purchase order, and he did not catch that mistake until May 2003. Making a mistake is neither immoral nor offensive to public policy.

The evidence fails to support plaintiff's allegation of common law fraud, and a violation of the North Carolina Consumer Protection Act, with respect to the transaction that occurred on January 25, 2003.

What transpired after May 2003, however, is another matter. Mr. Miles realized his mistake, and he communicated that mistake to Ms. Brown, who in turned passed the information on to the plaintiff. Obviously, Lincoln Logs was aware of the mistake. At that point plaintiff merely wanted to cancel the entire transaction and obtain a refund of her money. But Lincoln Logs adopted hard-headed and even self-destructive positions at various times, first insisting that it had the right to keep some of the money as "lost profit," and then later insisting that plaintiff should look to Ms. Brown for the return of the $17,975, and then continuing to hold the entire $23,975

17

even after Ms. Brown unequivocally denied any interest in those monies. And lest it be forgotten, all this started with a *unilateral* mistake by Mr. Miles. And neither should it be forgotten that Mr. Miles' actions on January 25 reasonably created the impression that plaintiff was dealing directly with Lincoln Logs. Even a modest investigation and a moment's analysis would have suggested to officials of Lincoln Logs that this was not the type of case in which they should obstinately insist that there was no privity between Lincoln Logs and the plaintiff and that it somehow had the right to keep some, most, or all of the money notwithstanding that it had not yet earned a penny of it. Although Mr. Miles' actions on January 25, 2003, were merely a mistake and in no way fraudulent or deceptive, the same cannot be said about Lincoln Logs' actions after May 2003. Lincoln Logs' actions were not "deceptive," since it was rather clear to everyone what Lincoln Logs was doing. But Lincoln Logs' actions were horribly unfair and, as noted earlier in this opinion, maddening. The North Carolina Consumer Protection Act does not outlaw unfair *and* deceptive acts; rather, the disjunctive "or" is used. An act can be either unfair, or deceptive, or both, as far as North Carolina's act is concerned. In all candor, the Court struggled with this aspect to some extent, since the dividing line between a mere breach of contract action and a violation of the Consumer Protection Act is not altogether clear in the abstract. But in the final analysis, it is as it always has been: it is the responsibility of the trier of fact, be it judge or jury, to determine the nature and quality of a given action in view of all the

surrounding circumstances.[13] Here, Lincoln Logs' intractability was so inexcusable under the circumstances that it goes beyond what would constitute a mere breach of contract, or conversion: it was immoral, oppressive, and unscrupulous, and therefore a violation of the North Carolina Consumer Protection Act.

Plaintiff should be awarded a judgment against Lincoln Logs in the amount of $23,975. Under N.C.G.S. § 75-16, treble damages apparently are mandatory. Thus, plaintiff should have judgment against the defendant, Lincoln Logs, for $71,975.

Under N.C.G.S. § 75-16-16.1, the Court *may* allow reasonable attorney's fees to the prevailing party. Plaintiff's attorney has filed an affidavit in which he asserts he has accumulated a fee of over $36,000. In light of the treble damages herein awarded, the Court declines to award attorney's fees. Actually, the case would have been more appropriate for an award of compensatory damages ($23,975) plus attorney's fees, and no treble damages. But, since treble damages are mandatory, the Court declines to award attorney's fees.

The Court is of the opinion that Regency Holdings, Inc., should be adjudged jointly and severally liable with Lincoln Logs. Lincoln Logs holds itself out as a manufacturer of log home kits. In reality, it more accurately could be described as a wholesaler of log home kits, serving as a conduit between Regency Holdings, Inc. – which owns the equipment with which, and the facilities in which, the kits are manufactured – and the dealers and of course the ultimate consumer. Lincoln Logs owns

---

[13]*See, e.g., Barbee v. Atlantic Marine Sales & Service, Inc.,* 446 S.E.2d 117 (N.C. App. 1994).

virtually nothing, and pays all that it earns as rent and other payments to Regency Holdings, Inc., which actually does the manufacturing. Regency and Lincoln Logs are joint ventures.

With respect to Shoff and Rivera, there is no basis upon which this Court may "pierce the corporate veil" or hold that Lincoln Logs is their alter ego. Doing business as a limited liability company is perfectly legitimate. To the extent Lincoln Logs is under-capitalized and intentionally kept bereft of assets with which to pay its creditors, it is Regency Holdings that must answer for that shortcoming and not Shoff and Rivera. The suit against Shoff and Rivera should be dismissed.

In conclusion, plaintiff shall have a judgment against Lincoln Logs and Regency Holdings, Inc., jointly and severally, in the amount of $71,975. The suit against Shoff and Rivera shall be dismissed. A judgment consistent with this Memorandum Opinion shall be prepared and filed.

E N T E R :

                                                        s/ Dennis H. Inman
                                                United States Magistrate Judge